Good morning, your honors. Gene Iredell on behalf of the appellate, Melford Wilson. This is a case in which we are appealing the district court's granting of summary judgment on four causes of action. False arrest, false imprisonment, malicious prosecution, and retaliation. The central thrust of the brief is that in making its ruling, the district court failed to apply the most basic rule concerning adjudication of summary judgment motions. That is that the evidence and conflicts in the evidence must be taken in the light most favorable to the non-moving party. The evidence that the defendant policeman proffered through his declaration was by and large accepted, and specifically contradictory evidence proffered in the form of deposition testimony conducted by counsel for that officer was either ignored or slighted or simply discounted. Taken in the light most favorable to the appellate, these are the facts. That on the night of the 16th of February 2007, he and a group of men who were 30 to 40 years old were at a house to watch the NBA Slam Dunk Championship, which is a prelude to the All-Star Game. At some point, five to six police cars and eight to ten police descended on the area. They were there at the instance of Sergeant Rick Davis, who said before they came in a little meeting, well here's our probable cause, here's what we're going to do. First of all, there was an illegally parked car. There was a car that was parked in the driveway, but it was blocking the sidewalk. And that's a violation of an ordinance. And second, I think somebody was smoking marijuana. So that's our probable cause. Let's go. Excuse me, counsel. Wasn't there evidence that this was a gang-related area where gangs were found, which would cause more than usual attention being paid to something like that? Judge Nelson, that was asserted by the sergeant, that it was a gang area. Mr. Wilson stated that he was not a member of a gang and he knew none of the other people there to be members of gangs. Did he disagree or did he assert that it was not a gang area? He did not assert that it was not a gang area. So if the denomination of an area of the city as a gang area makes it a Constitution-free zone, I lose the case. I don't think that the Constitution can apply differentially in essential functions according to what part of the city that you're in. And, in fact, the First Amendment... Could that be one factor, counsel? Excuse me. We're not saying that you do prior to your constitutional rights if you live in a gang-related area, but isn't that something the police could take into consideration? Yes. Yes, it is. In other words, all facts they can take into consideration. But I think it was raised here as a bugaboo in order to justify police action toward a group of men who were, in fact, not gang members, who were in their ages of 30s and 40s. And the older I get, the more I realize, even though your desire to do evil may be there, the real ability to do it is not the older you get. So this was a relatively benign group of people. Could I just interrupt for a moment? I meant to ask you a more threshold question. Yes. And we are familiar with the facts. We've read your briefing. The red brief, the government argues that you've waived your malicious prosecution claim by not addressing it in your opening brief. What's your position on that? My feeling is that we did address it in the opening brief, that we specifically said that we were raising the issue concerning those four specific causes of action that were ordered dismissed and that the malicious prosecution action is there because there was a showing of no probable cause and malice. So you're saying you didn't need to specifically address it because it was generally addressed in your other arguments? Yes. And that the elements are clearly known, no probable cause and malice, and that no probable cause is shown by the lack of probable cause and malice by that specific. Now, to my mind, this is the most telling piece of evidence. After Mr. Wilson says the following. Now, these are the following according in the light most favorable to him. You have the officer's declaration, which goes on and on and talks about aggressiveness and hostility and constant use of epithets, incitement, and paints this terrible, dangerous picture. But in his deposition, the officer could only remember three things that Mr. Wilson said. An epithet, a regrettable epithet, but one that's all too common. But one that nonetheless is constitutionally protected despite its derogation of mothers or those who sometimes love mothers inappropriately. Second, the use of the word trespass. And third, that Mr. Wilson said he thought that this was a waste of taxpayer money to have so many police here patting down people, holding them in custody, getting their identities, interrogating them. That was what he remembered in his deposition, but in his declaration, he goes on at great length. Here's what Mr. Wilson said, according to what he said. At first, after he came out of the house, he said, Wow, what is going on here? What do we need all these police officers here? And one of the policemen said, If you don't like it, you can talk to my sergeant. Mr. Wilson said to the police officer, The neighbors are going to be upset with us because they're going to say, What's going on in here? And the officer said to him, Shut up. Mr. Wilson then asked, apparently to Sergeant Davis, Does it take all this? Why are all of these people here? What's going on? We don't need all this attention. What is going on? And then, because there was a barrier that was up with a little string around it where they had planted grass, Mr. Wilson said, Hey, we have a barrier here. The sergeant said, Well, we can go up to the mailbox, referring to the mailbox at the front of the house. And Mr. Wilson said, Okay. Then a few seconds passed, and Mr. Wilson said, You MFers are going to get us in trouble. People are going to ask us what is going on. The sergeant then said, Don't call my officers MFers. Look, man, said Mr. Wilson, I'm sorry. I didn't mean to demean anybody. I didn't mean to talk about your officers. I'm sorry. That was the end of their interaction at that point. Mr. Wilson said he stood there silently for about two minutes with his hands in his pockets and then turned to somebody beside him and said, This is why the city budget is all messed up right now. Counselor, if I can interject. I mean, it's a nice argument. It's all in your briefs, and I'm aware of the facts, and I suspect the other judges are as well. So I'd really like to have you help me on a tough legal issue. Here's my question. Well, you may know what the different lines of authority are. Let's assume I'm always speaking for myself. I don't know that the panel will agree with this. This is a very hard case. Could be called the tale of two stories because, you know, Mr. Wilson's story so different from the officer Davis story. But assuming that on the summary judgment, we have to take Wilson's story credit is true. Assuming that we conclude that there's a Fourth Amendment violation in arresting him on the second prong of qualified immunity. One way it could be dealt with is we either say it's clearly it's not clearly established a firm or it is clearly established reverse. But now here's my legal question with my too long a predicate. There are cases, I'm sure, because I've been on some panels where we address this, where we send a qualified immunity issue back to a court to a district court where we say, OK, we're going to find a violation. But qualified immunity in this particular case can't be decided without further factual development. So the court gets a second shot at the qualified immunity after the facts are determined. I wonder if you're aware of that line of cases and if you have any comment, whether this is that type of case. I am aware of the line of cases, Judge Goulding. And you're exactly right that some of the cases on the appellate level, even if the qualified immunity issue is not focused on greatly, nonetheless, feel they can resolve it and resolve it in the appeal. And others remand it for a determination in the first instance by the district court, if especially the district court's original ruling on qualified immunity was based upon a mistaken or erroneous determination of the facts for summary judgment. I would think in this case I have two responses. First of all, we quoted on our brief what is a line of Supreme Court cases that goes back 50 years. Papa Christou, Wilson v. Gooding, the Lewis v. New Orleans, and many, many others, as well as Ninth Circuit cases, which essentially say, some of them even poetically, quoting Justice Frankfurter, that one man's vulgarity is another man's lyric, that criticism of the police in and of itself without physical obstruction cannot be criminally sanctioned. And I believe that that is bedrock law for purposes of qualified immunity. And secondly, let me just say this. There's one fact that is, to my mind, absolutely clear on qualified immunity and whether any officer or this officer would have known the conduct was illegal, and that is specifically the arrest of the plaintiff, where he goes up to him and he says, after the comment about this a waste of taxpayers' money, I'm going to find some reason to take you to jail. And Mr. Wilson says, well, I don't know why. I've just been standing here with my hands in my pocket. The officer says, take your hands out of your pocket. He does. Put him up in the air. Now put him down. Now put him up. Now put him down. Now put him up. And when he was too slow putting him up the third time in this little exercise of authoritarian control and humiliation being acted out, when he was too slow, the officer then says, you're resisting, you're under arrest. Now, to my mind, that little sequence, which has to be taken as true, shows malice for purposes of malicious prosecution, shows retaliation for the exercise of a First Amendment right, and is strong, if not conclusive evidence, on the lack of probable cause, because if he had a reason to effect the arrest, why would he say, I'm going to get some reason to arrest you, and then engage in this pretextual game-like behavior? However, in further answer and final answer, and if your prelude was too long, my answer is probably way too long, so I apologize, Judge Gould. No, it's not too long. If the court felt it appropriate, it's certainly within the court's power to say, we're reversing on the summary judgment issue with respect to the Fourth Amendment issue, but we're going to give the district court in the first instance the opportunity to make the qualified immunity determination, and that is certainly within the court's discretion, and it would depend on the factors that your Honor thinks are appropriate, including judicial economy, or giving the district court the right to make the determination in the first instance, which would be having the decision made at the lowest possible level to try to resolve it in that way. Thank you. Do you want to save the rest of your time? If I may, if I haven't rambled over it, I would like to. Seconds. Thank you. May it please the Court, my name is Jane Boardman, I represent Sergeant Kenneth Davis. It's important to remember that this is a case about interfering with the police. A lot of the cases that Plaintiff did cite in support of criticism of the police as not against the law have to do with disturbing the peace, and they have to do with creating some kind of disturbance, but that's not the case here. We're faced with a situation where this is the gang suppression unit. Their whole purpose is to seek out areas where there is a gathering of people who could potentially be gang members, find out who they are, document their information, and see if there's any warrants, get more information about it, and then that's sent on to the detectives who handle the gang units. Counsel, let me ask you this. Don't the conflicting versions of the faxes summarized by Mr. Davis and Mr. Wilson suggest that there are tribal issues of fact in this case? I don't believe they do, Your Honor, because the District Court was very clear when she said that even taking the Plaintiff's versions of the events into account, they still found that the officer had probable cause to arrest Wilson. The fact is that this was a small area. The Plaintiff specifically came out of the house to address the police. We're talking about a driveway area. The Plaintiff was standing at the edge of the driveway. The officers were only five to six feet away. He was drawing their attention, and again, because this is a gang area, the officers have to be super vigilant. Were there misbinding words in this case? I mean, were his words directed at the officer? Were the words inciting the crowd? I don't believe they were inciting the crowd to take some action, but what they were doing is other people were chiming in and not being as cooperative, in particular the people who they were trying to gather information from. And so that was causing, it was creating a sense of chaos in the area. There are men in, when the officers drove up, there were a lot more men. And his description about a sense of chaos. My problem is when I just read his deposition, as we're instructed to take the facts in the light most favorable to the nonmoving party, it's hard to pull out from those facts any sense of chaos or any incitement, as Judge Nilsen was saying. What, just looking at his tale, as Judge Gold was saying, the two tales, just looking at his tale, what's the best evidence there to establish probable cause on the part of the police officer to arrest him? In reviewing the plaintiff's deposition, he admits that the other members in the house and in the area started heckling, his words, heckling the police. He also admitted that even after Sergeant Davis asked him to be quiet, and he apologized for calling them a derogatory name, he admits that he continued asking questions, demanding answers, trying to draw the officers' attention away from what they were doing. This incident went on 25 to 30 minutes. Had the plaintiff not, or had Wilson not continually barraged the officers with questions and demanded their attention, they would have been there and gone in less than 15 minutes. So we need to look at, and it's not disputed that the officers' actions were delayed at the time of the arrest. This stretched on far longer than it needed to. After everybody scattered and went to the house, there were only a handful of people left to interview. So how long does it take to interview four people? Not very long if they're not bothered. So I believe that if you look at the evidence, the plaintiff admits that even after he was asked to be quiet and told what was going on and saying, look, if you keep bothering us, then there's a possibility you could be arrested. Just let us do our job and we're going to be gone. He admits he kept talking, and he admits that other people kept heckling the officers. So I think that that, even the officers... If I could please interject a question on that. I think it's a very hard case because, as I said earlier, you have these two stories so diametrically opposed. But if we focus, as Judge Akuda has said, just on his story, which we have to accept as true now, you've said that the problems are that you've got this heckling, and it keeps asking him questions. Well, first, I guess I have some trouble seeing, you know, why is he responsible if there's heckling by others? Why is that probable cause to arrest him? Maybe you could address that. And second, as for him continuing to ask them questions, well, you know, they say it's a free country. So why can't a citizen keep asking questions of police? Like, why are you here? Why are you spending the taxpayers' money? So I'd like to hear your answers on those. And also, your answer to the question I posed to your opposing colleague, that is, is this the type of case where if we determine that on the disputed facts, that if we credit his facts, there's a Fourth Amendment violation? Is it the type of case where the qualified immunity issue should go to the district court first? With regard to the heckling, I think that the issue is, if Plaintiff is talking, even in his normal voice, or just a little bit raised, and then other people are chiming in, and the multitude of people, that just alone causes more noise. And these officers are not very far away from him. It would be one thing if he was directing his comments only to Sergeant Davis, who was observing the scene. But he was directing the questions to the officers who were trying to do their job. So if they're trying to focus on this person, ask him questions, listen to what he's saying, and somebody keeps chiming in and asking him questions and demanding answers, that's distracting, and they're not able to focus on what they're doing. The question about, for argument's sake, if there is no probable cause, the court was very clear that she still felt that the officer was entitled to qualified immunity, because a reasonable officer, given the same circumstances that Sergeant Davis was faced, would still find that there was probable cause to arrest Mr. Wilson, based on what was happening at the time. So I don't believe that. Obviously, the court does have the ability to do that, discretion to do that. We would argue that that shouldn't be done, because the court was very clear, district court was very clear that taking everything into account, crediting all of Mr. Wilson's statements about what happened, they still felt that the officer was protected by qualified immunity. Counsel, if that approach is taken, I'm not saying it would be. But if it is, where does the district court make that qualified immunity decision, just procedurally? Does the district court let the case go to trial and hear all the evidence at trial and then assess qualified immunity after a verdict? Or does the district court give the question to the jury with some instruction? Or does the district court decide it ahead of trial? Well, the whole purpose of qualified immunity is to not make the officer go to trial. So I would believe that that would need to be made a determination before it went to trial, because the whole purpose of being immune from something is to not have to be subjected to the rigors of trial and going forward with the case. So I would think that that would have to be made prior to the trial. Even where you have conflicting testimony, the trial court judge doesn't have to listen to that? No, I'm not saying that. But I am saying that, you know, the district court was very clear that she did credit Mr. Wilson's testimony and did look at the things in light and was favorable to him, but still just found that the officer had probable cause and that a reasonable officer would have believed that as well. Do you know, you're closer to practice than I am, certainly, so you might know what I don't know. But are there cases where district courts give special interrogatories to a jury to return with their verdict, like answering questions that would relate to a qualified immunity decision and then make the qualified immunity decision afterwards? You know, honestly, Your Honor, I don't know. I don't practice in this type of law extensively, so I honestly just don't know the answer to that. I apologize. No apologies necessary. I don't know either, actually. So unless the court has anything further? No. Thank you. Thank you. If I may, Judge Gould, the answer to Your Honor's question is that that procedure is occasionally used in complex cases where the district court judge feels that a specific finding of fact is critical to the determination of qualified immunity. In about 95% of the cases, the court, as a matter of law, finds the issue of qualified immunity and it really sort of drops out of the case at the jury stage. But in some cases where a critical fact will determine the applicability of qualified immunity, specific interrogatories are put to the jury and that's a permissible tactic. Do you have a case in sight to us? I don't, but I can get you one. All right. Speaking for myself, I would like to have you submit such a case. If I might, I will do so, Your Honor. Yes, of course. May I just say three very brief things? First of all, counsel conceded that there was no incitement of the crowd to take some action. And that's the First Amendment test. That First Amendment speech cannot be criminally punished unless there is some imminent danger of action. And to complain to the police with all due respect, I suppose it's the viewpoint that you take, whether you're the citizen who feels they're being unduly hassled or the police officer who says, I'm just doing my job. But the thing that separates us from police states is that our citizens have the right to avoid any supine and obsequious necessity to bow to authority and can even question it so long as there's no obstruction of a physical nature. You're halfway over time, so if you could make your remaining points quickly, I'd appreciate it. Well, just this. Nobody here had a warrant outstanding for them. There was nobody on probation or parole. Nobody refused to have their identity checked. And the reason why it took 20 or 30 minutes was because they ran warrants, ran the names of the people to see if there were warrants outstanding. So they were detaining them outside in this yard in full view of the neighbors for all of that time. And I've spoken enough. Thank you, Jessica. Thank you. So the case of Wilson v. City of San Diego is submitted. And the case of Clayton v. Donahoe is submitted on the briefs. So we're adjourned for the week.
judges: Nelson, Gould, Ikuta